UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHRISTOPHER J. KEENAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:14-CV-335-MGG |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

On October 23, 2014, Plaintiff Christopher J. Keenan ("Keenan") filed his complaint in this Court seeking remand of the Defendant Acting Commissioner of Social Security's ("Commissioner"), final decision denying his application for Social Security Income ("SSI") and Disability Insurance Benefits ("DIB"). On May 22, 2015, Keenan filed an opening brief in support of his Social Security appeal. On August 18, 2015, the Commissioner filed a response requesting that the Court affirm the Commissioner's decision. On September 28, 2015, Keenan filed a reply brief. This Court may enter a ruling in this matter based on the parties consent, 28 U.S.C. § 636(c), and 42 U.S.C. § 405(g).

**I.  PROCEDURE**

On May 31, 2013, Keenan filed an application for SSI and DIB with the Social Security Administration ("SSA") pursuant to 42 U.S.C. § 1382c(a)(3) and 42 U.S.C. § 423(d) alleging disability beginning August 5, 2012. Keenan's application was denied initially on August 29, 2013, and then again on October 17, 2013. On March 6, 2014, a hearing was held before an administrative law judge ("ALJ") where Keenan, an impartial vocational expert, and Kennan's father, Michael Keenan, appeared and testified. On May 28, 2014, the ALJ issued his decision finding that Kennan was not disabled at Step Five of the evaluation and denied his application

for DIB and SSI. On August 22, 2014, the Appeals Council denied Keenan's request for review, making the ALJ's decision the final decision of the Commissioner. Through this action, Keenan seeks judicial review of the Commissioner's final decision pursuant to sentence four of 42 U.S.C. § 405(g).

## II.     RELEVANT BACKGROUND

Keenan was born on July 7, 1980, making him 32 years old on the date of his SSI and DIB applications, and has limited education—the extent of which Keenan has reported inconsistently. At the time of the March 2014 hearing, Keenan was unemployed. Prior to the alleged onset date, Keenan worked as a short order cook and general foundry worker.

### A.     Hearing Testimony and Medical Evidence

Keenan has allegedly suffered his entire life from both physical and chronic, ongoing, and significant mental illness. Physically, Keenan testified that he has dealt with liver problems, pancreatitis, kidney problems, hepatitis C, peptic ulcer disease, rapid heartbeat, thyroid issues, and hypertension. Since the alleged onset date in August 2012, Keenan was hospitalized for overnight treatment of renal insufficiency from August 31, 2012, until September 1, 2012. At follow up visits with Dr. Wiersema, a gastroenterologist, Keenan complained of generalized pain, muscle aches, and other abdominal issues. Keenan raised similar concerns during visits from September 2012 through December 2013 with Nurse Practitioner McKinley in the office of his primary care physician. Examinations revealed nothing conclusive to explain Keenan's asserted physical or psychiatric symptoms. Despite recommendations from Dr. Wiersema, Keenan declined further testing due to the cost involved.

Keenan's medical records show that Keenan's physical conditions generally subsided with time or treatment. In addition, medical records from visits to various doctors, including psychiatrists, reveal that Keenan reported his physical symptoms inconsistently. Sometimes he claimed to suffer symptoms while other times he claimed no symptoms. Nevertheless, Keenan testified at the hearing before the ALJ "that he becomes short of breath when walking, that being around heat was problematic when he was working as a cook, and that he is limited to lifting five to ten pounds." Doc. No. 10 at 23. Keenan also "reported difficulties with dropping things," using an inhaler every four hours or so, and becoming "extremely winded" climbing stairs. *Id*. Notably, Keenan's medical records include no prescription for an inhaler. Keenan's father also testified at the hearing that Keenan "always had physical limits," and that his work in the kitchen resulted in dehydration and breathing problems. *Id.*

Keenan's medical records also show that he had a history of significant substance abuse resulting in several instances of inpatient treatment before the alleged onset date. Evidence demonstrates that Keenan has not used alcohol or illegal substances since the alleged onset date.

Keenan was also treated for mental health issues during the alleged disability period. At the hearing, Keenan testified that hallucinations have been a problem all his life and that his first diagnosis of paranoia and delusions came in first grade. He further stated that he experiences mood changes with more frequent lows that lead him to isolate himself. In addition, Keenan reported panic attacks that cause breathing difficulty, increased tension, and disorientation. Keenan acknowledged that his symptoms are lessened by medication but that some symptoms

remain. He also reported a total breakdown requiring inpatient treatment beginning in May 2013 and stated that he had also required inpatient treatment multiple other times during his life.

During the disability period at issue with Keenan's instant application for benefits, he only required inpatient mental health treatment once from May 18, 2013, through June 7, 2013, due to paranoia, psychosis, and suicidal ideation. Of note, Keenan's only physical care during his inpatient treatment was for an acute upper respiratory infection. After being released from inpatient treatment, Keenan initiated ongoing outpatient psychiatric care at the Bowen Center on June 10, 2013, and then began treatment with psychiatrist S. Maharjan, M.D., on July 23, 2013.

The record reflects monthly visits with Dr. Maharjan through December 17, 2013, followed by one last visit on March 11, 2014, about a week after the administrative hearing before the ALJ and about six weeks later than originally scheduled. During his monthly visits, Keenan reported improvement of his symptoms following the inpatient treatment, but continued to report hearing voices and experiencing visual hallucinations. Dr. Marharjan diagnosed Keenan with mood disorder, psychosis, history of polysubstance dependence in remission, and antisocial personality traits along with the rule out diagnoses of schizoaffective disorder and PTSD, which were treated with medications. Between his December and March visits, Keenan stopped taking his medications regularly. As a result, Keenan's symptoms returned. Dr. Maharjan encouraged Keenan to restart his medications and scheduled a follow up appointment two months later.

As part of his disability application, Keenan also underwent consultative examinations. On July 23, 2013, Dr. Onamusi performed a consultative physical examination. Keenan reported many of his alleged physical conditions, but also indicated that he could lift 30 pounds, complete

4

household chores and self-care, and drive. Dr. Onamusi reported that the examination was normal but for some abdominal pain, identified no physical restrictions on Keenan's ability to work, and opined that Keenan was capable of gainful employment.

The record includes a consultative psychological examination from November 20, 2012, that was conducted as part of a previous application. As relevant here, Keenan reported to the examiner that he spent time with his son, took him to school of Mondays, watched television and checked Facebook on a regular basis.

In late July 2013, Michael Scherbinski, Ph.D. conducted another consultative psychological examination of Keenan. Keenan presented to Dr. Scherbinski similarly reporting that he was independent with self-care. However, Keenan also reported conflicting information such as that he could not drive and that he had only two daughters. Dr. Scherbinski opined that "[t]aken together, [Keenan's] abilities would likely allow him to potentially gain and/or maintain employment[, but that given his mental health history, his ability to consistently meet demands in a work environment may be impacted at times, particularly when non-compliant in taking his prescribed medications." Doc. No. 10 at 727.

### B. The ALJ's Decision

After the hearing, the ALJ issued a written decision reflecting the following findings based on the five-step disability evaluation prescribed by the SSA's regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.[1] At Step One, the ALJ found that Keenan has not engaged in substantial gainful activity since his alleged onset date of August 5, 2012. At Step Two, the ALJ found that Keenan has the following severe impairments: bipolar disorder, mood disorder, major

---

[1] Because the regulations governing DIB and SSI are identical, the Court will cite only to the DIB regulations found in 20 C.F.R. pt. 404.

depression, psychosis, social phobia, and antisocial personality traits. At Step Three, the ALJ found that Keenan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then determined that Keenan retains the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but is limited to no detailed or complex job instructions; no fast-paced work or work requiring a regimented pace of production; only casual, superficial, or brief interactions with others, including supervisors, coworkers, and the general public; no exposure to intense/critical supervision; and is best suited to work alone, in semi-isolation from others, or as part of a small group.

After determining Keenan's RFC, the ALJ moved to Step Four and found that Keenan is unable to perform any past relevant work. At Step Five, the ALJ found that considering Keenan's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. Based on these findings, the ALJ determined that Keenan was not disabled from August 5, 2012, the alleged onset date, through May 28, 2014, the date of the ALJ's decision.

## III. ANALYSIS

### A. Standard of Review

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Substantial evidence is more than a mere scintilla but may be less than the weight of the evidence. *Sheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Thus, substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Kepple v. Massanari*, 468 F.3d 513, 516 (7th Cir. 2001).

A reviewing court is not to substitute its own opinion for that of the ALJ or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Minimally, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ need not specifically address every piece of evidence in the record, but must present a "logical bridge" from the evidence to his conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010).

### B. Issues for Review

Keenan seeks remand of the ALJ and Appeals Council decision, arguing that: (1) the ALJ failed to properly evaluate whether Keenan's severe mental impairments met or medically equaled a Listing at Step Three; (2) the RFC is incomplete and not supported by substantial evidence because (a) the ALJ failed to consider whether any of Keenan's non-severe physical impairments, when considered in combination with his severe mental impairment, would cause limitations of his ability to work and (b) the ALJ's credibility determination was patently wrong, and (3) the ALJ failed to refer expressly to limitations of concentration, persistence, or pace in the hypothetical posed to the vocational expert at the hearing.

Before reaching those key issues, however, the Court must dispose of one last overarching argument raised by Keenan. In his reply brief, Keenan alleges that the ALJ committed harmful legal error by applying a stricter burden of proof than required in determining whether he is disabled. The Social Security regulations make clear that disability decisions, at all levels, are to be decided based on a preponderance of the evidence. 20 C.F.R. §§ 404.9092, 404.920, 404.941, 404.948, 404.953. Keenan infers from the analysis in the ALJ's opinion coupled with commentary in the Commissioner's instant response brief that the Commissioner required a far greater quantum of proof that the applicable preponderance of the evidence standard. As a result, Keenan asks the Court to conduct a *de novo* review to determine whether Keenan established disability by a preponderance of the evidence, or in other words, whether the ALJ committed a legal error in his disability determination. Indeed, questions of law are subject to *de novo* review. *Ward v. Holder*, 632 F.3d 395, 397 (7th Cir. 2011); *United States v. Goad*, 44 F.3d 580, 585 (7th Cir. 1995). Keenan's burden of proof argument is not persuasive.

First, Keenan identifies this argument for the first time in its reply brief, which did not give the Commissioner an opportunity to respond. Second, Keenan did not develop his argument fully even if his late argument is excused. In essence, Keenan contends that the ALJ did not articulate the burden of proof required and then rejected the preponderance of evidence that Keenan provided to show that he is disabled. Keenan only cites to the regulations that explain that disability determinations are made based on the preponderance standard and to *Ward* and *Goad*, which confirm the Court's authority to conduct *de novo* review of questions of law. Keenan does not direct the Court to anything specific in the ALJ's analysis or the

8

Commissioner's response brief to show that anything but the preponderance standard was applied. Keenan simply asserts that he "has provided sufficient persuasive evidence to satisfy the preponderance standard." Doc. No. 28 at 3. Yet with nothing more, Keenan has not convinced the Court that any legal error occurred. Therefore, the Court will address each of Keenan's remaining arguments for remand.

### 1. Step Three Listing Analysis

Keenan challenges the ALJ's Step Three Listing analysis. At Step Three of the disability analysis, the ALJ must determine whether a claimant's impairment or combination of impairments is of a severity to meet to medically equal the criteria of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. 20 C.F.R. § 404.1520(a)(4)(iii). At Step Three, only a claimant's medical evidence, not evidence of vocational factors or actual functional ability, are considered. 20 C.F.R. 404.1525(b)(1). If the claimant produces medical proof from a physician that he meets all the components of a Listing, he is presumptively eligible for benefits. 20 C.F.R. § 404.1520(d).

Here, the ALJ specifically discussed Listings 12.03 (schizophrenic, paranoid and other psychotic disorders), 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). Listings 12.03, 12.04, and 12.06 all require the ALJ to determine whether the claimant meets or medically equals the specific medical criteria included in Paragraph A of each Listing and whether the claimant satisfied the requirements in either Paragraph B or Paragraph C for each Listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Aside from the specific names for each Listing, the Paragraph B and Paragraph C criteria for Listings 12.03, 12.04, and 12.06 are identical. *Id.* In contrast, Listing 12.08 requires the ALJ to

determine if the claimant satisfied Paragraph A and Paragraph B to meet or equal the Listing. *Id.* Paragraph A criteria medically substantiate the presence of a particular mental disorder, while the Paragraph B and C criteria describe impairment related functional limitations that are incompatible with the ability to do any gainful activity. *Id.*

Keenan contends that he has met or medically equaled all four of the Listings discussed by the ALJ despite the ALJ's decision to the contrary. However, the ALJ determined that Keenan had not satisfied either the relevant Paragraph B or the C criteria and therefore concluded that Keenan did not meet or medically equal any of the four Listings. The ALJ did not discuss whether Keenan presented sufficient evidence to meet the Paragraph A criteria for each listing because he assumed that the standard was met for each listing under Paragraph A. Keenan does not challenge the ALJ's Paragraph A assumption. Therefore, the Court will also make that assumption. Therefore, the Court proceeds to Keenan's Paragraph B and C criteria arguments.

          a.       **Paragraph B Criteria**

To satisfy the Paragraph B criteria, a claimant must establish at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Thus, the Paragraph B criteria would have been satisfied if Keenan's mental impairments had caused at least two marked limitations, or one marked limitation with repeated episodes of decompensation. Keenan argues that the ALJ demonstrated a fundamental disregard for the episodic nature of mental illnesses by relying on only a handful

of statements from various sources to explain his conclusion that Keenan had the ability to perform normal daily activities and interact with some people.

In his Paragraph B analysis, the ALJ did not explicitly mention the periodic nature of Keenan's mental illness. Arguably, however, the ALJ acknowledged the ongoing and periodic nature of Keenan's mental impairments by citing both Keenan's own reports of relevant symptoms in his own Function Report dated June 20, 2013, as well as to various treating and consulting physicians from November 2012 through March 2014. The ALJ also cited to the assorted physicians' own assessments, which showed different results at different visits sometimes attributable to medication changes or stress and sometimes unexplained. Despite what could look like inconsistencies, the ALJ accepted all of the physicians' consistent diagnoses of mental impairments. Indeed, this suggests the ALJ's understanding that Keenan's impairments resulted in symptoms that ebb and flow, or that Keenan's illnesses manifested periodically rather than constantly.

With that said, the ALJ did not provide a logical bridge from his statements of Keenan's reported symptoms and the physicians' statements to his conclusions about each of the Paragraph B criteria. For instance, in considering Keenan's limitations in activities of daily living, the ALJ noted several different, and somewhat inconsistent, reports over time from Keenan about what he is able to do on his own then concluded that "[t]he record as a whole is insufficient to establish more than mild limitations in activities of daily living, due to mental impairment." Doc. No. 10 at 26. While there may be good reason to connect Keenan's statement to the ALJ's conclusion, the ALJ fails to articulate that connection. The ALJ does not

explain why the record only shows mild limitations and therefore has not provided a logical bridge upon which this Court can review his conclusion.

Similarly, the ALJ assessed Keenan's limitations in social functioning by comparing Keenan's testimony alleging chronic, ongoing, and significant mental illness to his medical records. The records cited referenced both Keenan's own reports of symptoms to assorted physicians from the onset date in August 2012 through the date of the ALJ's decision in May 2014 as well as those physicians' reports of their examination findings. After delineating these facts, the ALJ indicated that he was giving some deference to Keenan's hearing testimony. Doc. No. 10 at 26. The ALJ then went on to say that Keenan "has been capable of appropriate interactions during the period" and that "[w]hile deficits in this domain are supported, they are not marked, particularly with medication compliance." *Id.* Even though the ALJ alludes to the effects of medication compliance on Keenan's social interactions, he still does not build a sufficient logical bridge from the obvious inconsistencies in the record to his conclusion that Keenan suffers from less than marked limitations in social functioning.

The ALJ followed the same pattern in his analysis of Keenan's limitations in concentration, persistence, and pace. Ultimately, the ALJ gave some deference to Keenan's reported symptoms in his June 2013 Function Report, especially his reported auditory hallucinations, but concludes that "the record as a whole fails to establish marked limitations" without articulating the required logical bridge. *Id.*

The Court does not even need to review the ALJ's analysis of Keenan's episodes of decompensation because the lack of logical bridge in his analysis of the other three Paragraph B criteria shows that the ALJ's Step Three Listing analysis is not supported by substantial

12

evidence. Notably, however, the ALJ only specifies Keenan's May-June 2013 inpatient treatment as an episode of decompensation of extended duration during the relevant period. Even if the ALJ's Paragraph B analysis was sufficient, his Paragraph C analysis would also doom the ALJ's Listing analysis.

### b. Paragraph C Criteria

For Listings 12.03, 12.04, and 12.06, which are relevant to Keenan, a claimant can meet or medically equally the Listing if they satisfy either Paragraph A and B criteria or the Paragraph A and C criteria.[2] The Paragraph C criteria are identical for Listings 12.03 and 12.04 and require a claimant to have a medically documented history of a chronic mental disorder of at least two years' duration that has caused greater than a minimal limitation of ability to do basic work activities, with signs or symptoms currently attenuated by medication or psychosocial support, and one of the following:

(1) [r]epeated episodes of decompensation, each of extended duration; or
(2) [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
(3) [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00, 12.03, 12.04. The Paragraph C criteria for Listing 12.06 requires that the claimant's mental disorder result in a "complete inability to function independently outside the area of one's home." *Id.* at § 12.06.

Keenan contends that has shown by a preponderance of the evidence that he satisfied the relevant Paragraph C criteria. As Keenan points out, the ALJ does not call into question that he

---
[2] Listing 12.08 does not has not Paragraph C criteria and can only be met or medically equaled by satisfying both the Paragraph A and B criteria.

has a history of mental illness dating back to his early childhood as evidenced by hospitalizations, suicide attempts, and substance abuse documented and unchallenged in the record. Keenan also challenges the ALJ's use of boilerplate language used to describe his Paragraph C conclusion. The ALJ stated:

> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The evidence indicates [Keenan's] mental impairments would not be expected to cause decompensation if he were placed in a typical work setting. [Keenan] has been able to function outside a highly-supportive living arrangement and outside the environment of his own home.

Doc. No. 10 at 27.

Keenan baldly asserts that the ALJ's language here "appears verbatim in many decisions," provides no other examples of cases where this exact language was used. Doc. No. 28 at 6 n. 2. Keenan does, however, cite to several cases that supports the Seventh Circuit's general aversion to the use of boilerplate language in Social Security decisions. *Id.* at 6 (citing *Pierce v. Colvin*, 739 F.3d 1046, 1060 (7th Cir. 2014); *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). Nevertheless, none of these cases analyze Paragraph C boilerplate language making this particular argument of Keenan's less persuasive.

Even though the boilerplate language argument may not win the day, Keenan has directed the Court's attention to a faulty Paragraph C analysis. Boilerplate or not, the ALJ's Paragraph C analysis brief and conclusory without any logical bridge. No doubt the ALJ's entire decision cites multiple facts from the record that would be relevant to the Paragraph C analysis, but the ALJ did not identify which facts persuaded him that Keenan did not satisfy the Paragraph C criteria. Without those facts, the ALJ's analysis once again lacks the logical bridge necessary

14

to allow this Court to meaningfully review the ALJ's decision. Therefore, the ALJ's Listing analysis is not supported by substantial evidence and must be remanded.

Notably, it is the lack of a logical bridge that is persuasive here, not Keenan's arguments. As the Commissioner rightly states in her brief, Keenan also made brief and conclusory statements in his opening and reply briefs about the quantum of evidence in the record to show that Keenan has satisfied the Paragraph C criteria. Plaintiff has not cited to sufficiently specific evidence to support his broad assertions. Therefore, the Court cannot determine whether Keenan is disabled under the Social Security Act. Instead, the Court defers to the ALJ on remand to make that determination and to draft a decision that provides the necessary logical bridge.

In addition, the Court need not reach Keenan's argument about whether the ALJ should have sought further expert advice rather than relying upon allegedly outdated and incomplete state agency non-examining opinions. Without reaching any conclusion about the ALJ's use of expert advice, the Court advises the Commissioner to ensure that expert opinions are used in compliance with SSR 96-6p, which all parties here agree governs this issue.

### 2. RFC Analysis

The ALJ's RFC determination also forces this Court to remand Keenan's case for further consideration by the Commissioner. Keenan has demonstrated that the ALJ's RFC analysis is incomplete because his decision does not reflect consideration of Keenan's non-severe physical impairments in combination with his severe mental limitations in his RFC determination.

An individual's RFC demonstrates his ability to do physical and mental work activities on a sustained basis despite functional limitations caused by any medically determinable impairment(s) and their symptoms, including pain. 20 C.F.R. § 404.1545; SSR 96-8p 1996. In

making a proper RFC determination, the ALJ must consider all of the relevant evidence in the case record. 20 C.F.R. § 404.1512(c). In so doing, the ALJ is obligated to consider the combined effect of all of a claimant's impairments, both severe and non-severe. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003); SSR 96-8p.

Additionally, "[c]areful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." SSR 96-8p. However, the claimant must provide the ALJ with medical evidence showing how his impairments affect his functioning. 20 C.F.R. § 404.1545. Therefore, when the record does not support specific physical or mental limitations or restrictions on a claimant's work-related activity, the ALJ must find that the claimant has no related functional limitations. *See* SSR 96-8p.

At Step Two, the ALJ determined that Keenan suffered from the severe impairments of social phobia, bipolar disorder, mood disorder, major depression, psychosis, and antisocial personality traits. In contrast, the ALJ found that Keenan had provided insufficient evidence to establish even one his allegedly severe physical impairments, including hepatitis C, pancreatitis, cirrhosis, sinus tachycardia, mitral valve prolapse, hypertension, and peptic ulcer disease, as severe. Accordingly, the ALJ was obligated to consider the combined effect on Keenan's severe mental impairments and his non-severe physical impairments in determining his RFC.

In his RFC analysis, however, the ALJ cited to no evidence of Keenan's limitations caused by his non-severe physical impairments. The ALJ simply stated that "[Keenan's] testimony and allegations regarding physical impairments ha[d] been discussed above and will be not be repeated." Doc. No. 10 at 28. The ALJ then began his RFC analysis based on

Keenan's severe mental impairments alone before referencing his Step Two severity analysis concluding that Keenan's alleged "limiting physical conditions are not supported by the objective evidence." *Id.* at 31.

The Commissioner argues that the ALJ's Step Two analysis shows that there were no limitations resulting from Keenan's non-severe physical impairments and that consequently, there were no physical limitations to incorporate into the RFC. Yet, the Commissioner fails to consider any combined effect of Keenan's severe and non-severe impairments on his RFC. "While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." SSR 96-8p. Limitations from non-severe impairments in conjunction with limitations imposed by severe "may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

What we have here is yet another instance where the ALJ failed to create the logical bridge within his RFC analysis. The ALJ may have actually considered the effects of both Keenan's severe and his non-severe impairments on his RFC. Unfortunately, the decision does not articulate that path of logic in such a way that the Court can determine whether he actually considered all of the relevant evidence in the record in defining Keenan's RFC. Without that logical bridge, the ALJ's RFC determination is not supported by substantial evidence and justifies remand.

### 3. Other RFC-Related Arguments

Having determined that remand is warranted based on the ALJ's Step Three Listing analysis and his RFC analysis, the Court need not reach any conclusions as to Keenan's other RFC-related arguments regarding the ALJ's credibility analysis and his incorporation of limitations on concentration, persistence, or pace ("CPP") into the RFC and hypothetical to the VE. *See Key v. Sullivan*, 925 F.2d 1056, 1061 (7th Cir. 1991) ("If an issue is left open after remand, the lower tribunal is free to decide it."). As to credibility, however, the ALJ's decision and the parties' briefs here are premised on the requirements set forth in SSR 96-7p, which was superseded by SSR 16-3p on March 16, 2016. Therefore, the Court advises the ALJ to consider the role of SSR 16-3p, if any, in its proceedings on remand.

In addition, the Court notes that the Seventh Circuit is but one circuit court that has taken a strong stand against use of the boilerplate limitations to "unskilled work" or "simple, routine tasks" in RFCs. Courts have held that these boilerplate limitations typically are not enough to accurately reflect a claimant's limitations in concentration, persistence, and pace caused by mental illness. *See O'Connor-Spinner*, 627 F.3d at 618–21; *Stewart v. Astrue*, 561 F.3d 679, 684–85 (7th Cir. 2009); *see also Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)). Therefore, without further commentary on the ALJ's work here, the Court commends the jurisprudence cited above for the ALJ's consideration on remand to ensure that both Keenan's RFC and the hypothetical presented to the vocational expert adequately reflect Keenan's ability to work.

**IV.    CONCLUSION**

Because the ALJ's Step Three Listing Analysis and his RFC analysis are not supported by substantial evidence, the Court **GRANTS** Keenan's request to remand this case. [Doc. No. 19]. This case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion. The Clerk is **DIRECTED** to terminate the case.

**SO ORDERED.**

Dated this 12th day of September, 2016.

S/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge